(Slip Opinion)          OCTOBER TERM, 2008          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HERRING *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 07–513.   Argued October 7, 2008—Decided January 14, 2009

Officers in Coffee County arrested petitioner Herring based on a warrant listed in neighboring Dale County's database. A search incident to that arrest yielded drugs and a gun. It was then revealed that the warrant had been recalled months earlier, though this information had never been entered into the database. Herring was indicted on federal gun and drug possession charges and moved to suppress the evidence on the ground that his initial arrest had been illegal. Assuming that there was a Fourth Amendment violation, the District Court concluded that the exclusionary rule did not apply and denied the motion to suppress. The Eleventh Circuit affirmed, finding that the arresting officers were innocent of any wrongdoing, and that Dale County's failure to update the records was merely negligent. The court therefore concluded that the benefit of suppression would be marginal or nonexistent and that the evidence was admissible under the good-faith rule of *United States* v. *Leon*, 468 U. S. 897.

*Held:* When police mistakes leading to an unlawful search are the result of isolated negligence attenuated from the search, rather than systemic error or reckless disregard of constitutional requirements, the exclusionary rule does not apply. Pp. 4–13.

   (a) The fact that a search or arrest was unreasonable does not necessarily mean that the exclusionary rule applies. *Illinois* v. *Gates*, 462 U. S. 213, 223. The rule is not an individual right and applies only where its deterrent effect outweighs the substantial cost of letting guilty and possibly dangerous defendants go free. *Leon,* 468 U. S*.,* at 908–909. For example, it does not apply if police acted "in objectively reasonable reliance" on an invalid warrant. *Id.*, at 922. In applying *Leon*'s good-faith rule to police who reasonably relied on mistaken information in a court's database that an arrest warrant

Syllabus

was outstanding, *Arizona* v. *Evans*, 514 U. S. 1, 14–15, the Court left unresolved the issue confronted here: whether evidence should be suppressed if the police committed the error, *id.,* at 16, n. 5. Pp. 4–7.

(b) The extent to which the exclusionary rule is justified by its deterrent effect varies with the degree of law enforcement culpability. See, *e.g.*, *Leon, supra,* at 911. Indeed, the abuses that gave rise to the rule featured intentional conduct that was patently unconstitutional. See, *e.g.*, *Weeks* v. *United States,* 232 U. S 383. An error arising from nonrecurring and attenuated negligence is far removed from the core concerns that led to the rule's adoption. Pp. 7–9.

(c) To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. The pertinent analysis is objective, not an inquiry into the arresting officers' subjective awareness. See, *e.g.*, *Leon, supra,* at 922, n. 23. Pp. 9–11.

(d) The conduct here was not so objectively culpable as to require exclusion. The marginal benefits that might follow from suppressing evidence obtained in these circumstances cannot justify the substantial costs of exclusion. *Leon, supra,* at 922. Pp. 11–13.

492 F. 3d 1212, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined. BREYER, J., filed a dissenting opinion, in which SOUTER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–513

BENNIE DEAN HERRING, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[January 14, 2009]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Fourth Amendment forbids "unreasonable searches and seizures," and this usually requires the police to have probable cause or a warrant before making an arrest. What if an officer reasonably believes there is an outstanding arrest warrant, but that belief turns out to be wrong because of a negligent bookkeeping error by another police employee? The parties here agree that the ensuing arrest is still a violation of the Fourth Amendment, but dispute whether contraband found during a search incident to that arrest must be excluded in a later prosecution.

Our cases establish that such suppression is not an automatic consequence of a Fourth Amendment violation. Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct. Here the error was the result of isolated negligence attenuated from the arrest. We hold that in these circumstances the jury should not be barred from considering all the evidence.

I

On July 7, 2004, Investigator Mark Anderson learned that Bennie Dean Herring had driven to the Coffee County Sheriff's Department to retrieve something from his impounded truck. Herring was no stranger to law enforcement, and Anderson asked the county's warrant clerk, Sandy Pope, to check for any outstanding warrants for Herring's arrest. When she found none, Anderson asked Pope to check with Sharon Morgan, her counterpart in neighboring Dale County. After checking Dale County's computer database, Morgan replied that there was an active arrest warrant for Herring's failure to appear on a felony charge. Pope relayed the information to Anderson and asked Morgan to fax over a copy of the warrant as confirmation. Anderson and a deputy followed Herring as he left the impound lot, pulled him over, and arrested him. A search incident to the arrest revealed methamphetamine in Herring's pocket, and a pistol (which as a felon he could not possess) in his vehicle. App. 17–23.

There had, however, been a mistake about the warrant. The Dale County sheriff's computer records are supposed to correspond to actual arrest warrants, which the office also maintains. But when Morgan went to the files to retrieve the actual warrant to fax to Pope, Morgan was unable to find it. She called a court clerk and learned that the warrant had been recalled five months earlier. Normally when a warrant is recalled the court clerk's office or a judge's chambers calls Morgan, who enters the information in the sheriff's computer database and disposes of the physical copy. For whatever reason, the information about the recall of the warrant for Herring did not appear in the database. Morgan immediately called Pope to alert her to the mixup, and Pope contacted Anderson over a secure radio. This all unfolded in 10 to 15 minutes, but Herring had already been arrested and found with the gun and drugs, just a few hundred yards from the sheriff's office.

*Id.,* at 26, 35–42, 54–55.

Herring was indicted in the District Court for the Middle District of Alabama for illegally possessing the gun and drugs, violations of 18 U. S. C. §922(g)(1) and 21 U. S. C. §844(a). He moved to suppress the evidence on the ground that his initial arrest had been illegal because the warrant had been rescinded. The Magistrate Judge recommended denying the motion because the arresting officers had acted in a good-faith belief that the warrant was still outstanding. Thus, even if there were a Fourth Amendment violation, there was "no reason to believe that application of the exclusionary rule here would deter the occurrence of any future mistakes." App. 70. The District Court adopted the Magistrate Judge's recommendation, 451 F. Supp. 2d 1290 (2005), and the Court of Appeals for the Eleventh Circuit affirmed, 492 F. 3d 1212 (2007).

The Eleventh Circuit found that the arresting officers in Coffee County "were entirely innocent of any wrongdoing or carelessness." *id.,* at 1218. The court assumed that whoever failed to update the Dale County sheriff's records was also a law enforcement official, but noted that "the conduct in question [wa]s a negligent failure to act, not a deliberate or tactical choice to act." *Ibid.* Because the error was merely negligent and attenuated from the arrest, the Eleventh Circuit concluded that the benefit of suppressing the evidence "would be marginal or nonexistent," *ibid.* (internal quotation marks omitted), and the evidence was therefore admissible under the good-faith rule of *United States* v. *Leon,* 468 U. S. 897 (1984).

Other courts have required exclusion of evidence obtained through similar police errors, *e.g., Hoay* v. *State,* 348 Ark. 80, 86–87, 71 S. W. 3d 573, 577 (2002), so we granted Herring's petition for certiorari to resolve the conflict, 552 U. S. \_\_\_ (2008). We now affirm the Eleventh Circuit's judgment.

## II

When a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation. The very phrase "probable cause" confirms that the Fourth Amendment does not demand all possible precision. And whether the error can be traced to a mistake by a state actor or some other source may bear on the analysis. For purposes of deciding this case, however, we accept the parties' assumption that there was a Fourth Amendment violation. The issue is whether the exclusionary rule should be applied.

## A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," but "contains no provision expressly precluding the use of evidence obtained in violation of its commands," *Arizona* v. *Evans*, 514 U. S. 1, 10 (1995). Nonetheless, our decisions establish an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial. See, *e.g.*, *Weeks* v. *United States*, 232 U. S. 383, 398 (1914). We have stated that this judicially created rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States* v. *Calandra*, 414 U. S. 338, 348 (1974).

In analyzing the applicability of the rule, *Leon* admonished that we must consider the actions of all the police officers involved. 468 U. S., at 923, n. 24 ("It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination"). The Coffee County officers did nothing improper. Indeed,

the error was noticed so quickly because Coffee County requested a faxed confirmation of the warrant.

The Eleventh Circuit concluded, however, that somebody in Dale County should have updated the computer database to reflect the recall of the arrest warrant. The court also concluded that this error was negligent, but did not find it to be reckless or deliberate. 492 F. 3d, at 1218.[1] That fact is crucial to our holding that this error is not enough by itself to require "the extreme sanction of exclusion." *Leon, supra,* at 916.

### B

1. The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable— does not necessarily mean that the exclusionary rule applies. *Illinois* v. *Gates*, 462 U. S. 213, 223 (1983). Indeed, exclusion "has always been our last resort, not our first impulse," *Hudson* v. *Michigan*, 547 U. S. 586, 591 (2006), and our precedents establish important principles that constrain application of the exclusionary rule.

First, the exclusionary rule is not an individual right and applies only where it "'result[s] in appreciable deterrence.'" *Leon, supra,* at 909 (quoting *United States* v. *Janis*, 428 U. S. 433, 454 (1976)). We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation. *Leon, supra,* at 905–906; *Evans, supra,* at 13–14; *Pennsylvania Bd. of Probation and Parole* v. *Scott*, 524 U. S. 357, 363 (1998). Instead we have focused on the efficacy of the rule in

---

[1] At an earlier point in its opinion, the Eleventh Circuit described the error as "'at the very least negligent,'" 492 F. 3d 1212, 1217 (2007) (quoting *Michigan* v. *Tucker*, 417 U. S. 433, 447 (1974)). But in the next paragraph, it clarified that the error was "a negligent failure to act, not a deliberate or tactical choice to act," 492 F. 3d, at 1218. The question presented treats the error as a "negligen[t]" one, see Pet. for Cert. i; Brief in Opposition (I), and both parties briefed the case on that basis.

deterring Fourth Amendment violations in the future. See *Calandra, supra,* at 347–355; *Stone* v. *Powell*, 428 U. S. 465, 486 (1976).[2]

In addition, the benefits of deterrence must outweigh the costs. *Leon, supra,* at 910. "We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." *Scott, supra,* at 368. "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs." *Illinois* v. *Krull*, 480 U. S. 340, 352–353 (1987) (internal quotation marks omitted). The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free— something that "offends basic concepts of the criminal justice system." *Leon, supra,* at 908. "[T]he rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." *Scott, supra,* at 364–365 (internal quotation marks omitted); see also *United States* v. *Havens*, 446 U. S. 620, 626–627 (1980); *United States* v. *Payner*, 447 U. S. 727, 734 (1980).

These principles are reflected in the holding of *Leon*: When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted "in objectively reasonable reliance" on the subsequently invalidated search warrant. 468 U. S., at 922. We (perhaps confusingly) called this objectively

_____

[2] JUSTICE GINSBURG's dissent champions what she describes as "'a more majestic conception' of . . . the exclusionary rule," *post*, at 5 (quoting *Arizona* v. *Evans*, 514 U. S. 1, 18 (1995) (STEVENS, J., dissenting)), which would exclude evidence even where deterrence does not justify doing so. Majestic or not, our cases reject this conception, see, *e.g., United States* v. *Leon*, 468 U. S. 897, 921, n. 22 (1984), and perhaps for this reason, her dissent relies almost exclusively on previous dissents to support its analysis.

reasonable reliance "good faith." *Ibid.*, n. 23. In a companion case, *Massachusetts* v. *Sheppard*, 468 U. S. 981 (1984), we held that the exclusionary rule did not apply when a warrant was invalid because a judge forgot to make "clerical corrections" to it. *Id.,* at 991.

Shortly thereafter we extended these holdings to warrantless administrative searches performed in good-faith reliance on a statute later declared unconstitutional. *Krull, supra,* at 349–350. Finally, in *Evans*, 514 U. S. 1, we applied this good-faith rule to police who reasonably relied on mistaken information in a court's database that an arrest warrant was outstanding. We held that a mistake made by a judicial employee could not give rise to exclusion for three reasons: The exclusionary rule was crafted to curb police rather than judicial misconduct; court employees were unlikely to try to subvert the Fourth Amendment; and "most important, there [was] no basis for believing that application of the exclusionary rule in [those] circumstances" would have any significant effect in deterring the errors. *Id.,* at 15. *Evans* left unresolved "whether the evidence should be suppressed if police personnel were responsible for the error,"[3] an issue not argued by the State in that case, *id.,* at 16, n. 5, but one that we now confront.

2. The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct. As we said in *Leon*, "an

───────────

[3] We thus reject JUSTICE BREYER's suggestion that *Evans* was entirely "premised on a distinction between judicial errors and police errors," *post*, at 1 (dissenting opinion). Were that the only rationale for our decision, there would have been no reason for us expressly and carefully to leave police error unresolved. In addition, to the extent *Evans* is viewed as presaging a particular result here, it is noteworthy that the dissent's view in that case was that the distinction JUSTICE BREYER regards as determinative was instead "artificial." 514 U. S., at 29 (GINSBURG, J., dissenting).

assessment of the flagrancy of the police misconduct constitutes an important step in the calculus" of applying the exclusionary rule. 468 U. S., at 911. Similarly, in *Krull* we elaborated that "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" 480 U. S., at 348–349 (quoting *United States* v. *Peltier*, 422 U. S. 531, 542 (1975)).

Anticipating the good-faith exception to the exclusionary rule, Judge Friendly wrote that "[t]he beneficent aim of the exclusionary rule to deter police misconduct can be sufficiently accomplished by a practice . . . outlawing evidence obtained by flagrant or deliberate violation of rights." The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 953 (1965) (footnotes omitted); see also *Brown* v. *Illinois*, 422 U. S. 590, 610–611 (1975) (Powell, J., concurring in part) ("[T]he deterrent value of the exclusionary rule is most likely to be effective" when "official conduct was flagrantly abusive of Fourth Amendment rights").

Indeed, the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional. In *Weeks,* 232 U. S. 383, a foundational exclusionary rule case, the officers had broken into the defendant's home (using a key shown to them by a neighbor), confiscated incriminating papers, then returned again with a U. S. Marshal to confiscate even more. *Id.*, at 386. Not only did they have no search warrant, which the Court held was required, but they could not have gotten one had they tried. They were so lacking in sworn and particularized information that "not even an order of court would have justified such procedure." *Id.*, at 393–394. *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385 (1920), on which petitioner repeatedly relies, was similar; federal officials "without a shadow of authority" went to

the defendants' office and "made a clean sweep" of every paper they could find. *Id.*, at 390. Even the Government seemed to acknowledge that the "seizure was an outrage." *Id.,* at 391.

Equally flagrant conduct was at issue in *Mapp* v. *Ohio*, 367 U. S. 643 (1961), which overruled *Wolf* v. *Colorado*, 338 U. S. 25 (1949), and extended the exclusionary rule to the States. Officers forced open a door to Ms. Mapp's house, kept her lawyer from entering, brandished what the court concluded was a false warrant, then forced her into handcuffs and canvassed the house for obscenity. 367 U. S., at 644–645. See Friendly, *supra*, at 953, and n. 127 ("[T]he situation in *Mapp*" featured a "flagrant or deliberate violation of rights"). An error that arises from nonrecurring and attenuated negligence is thus far removed from the core concerns that led us to adopt the rule in the first place. And in fact since *Leon*, we have never applied the rule to exclude evidence obtained in violation of the Fourth Amendment, where the police conduct was no more intentional or culpable than this.

3. To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. The error in this case does not rise to that level.[4]

Our decision in *Franks* v. *Delaware*, 438 U. S. 154

---

[4] We do not quarrel with JUSTICE GINSBURG's claim that "liability for negligence . . . creates an incentive to act with greater care," *post,* at 7, and we do not suggest that the exclusion of this evidence could have *no* deterrent effect. But our cases require any deterrence to "be weighed against the 'substantial social costs exacted by the exclusionary rule,'" *Illinois* v. *Krull*, 480 U. S. 340, 352–353 (1987) (quoting *Leon*, 468 U. S., at 907), and here exclusion is not worth the cost.

(1978), provides an analogy. Cf. *Leon*, *supra*, at 914. In *Franks*, we held that police negligence in obtaining a warrant did not even rise to the level of a Fourth Amendment violation, let alone meet the more stringent test for triggering the exclusionary rule. We held that the Constitution allowed defendants, in some circumstances, "to challenge the truthfulness of factual statements made in an affidavit supporting the warrant," even after the warrant had issued. 438 U. S., at 155–156. If those false statements were necessary to the Magistrate Judge's probable-cause determination, the warrant would be "voided." *Ibid.* But we did not find all false statements relevant: "There must be allegations of deliberate falsehood or of reckless disregard for the truth," and "[a]llegations of negligence or innocent mistake are insufficient." *Id.*, at 171.

Both this case and *Franks* concern false information provided by police. Under *Franks*, negligent police miscommunications in the course of acquiring a warrant do not provide a basis to rescind a warrant and render a search or arrest invalid. Here, the miscommunications occurred in a different context—after the warrant had been issued and recalled—but that fact should not require excluding the evidence obtained.

The pertinent analysis of deterrence and culpability is objective, not an "inquiry into the subjective awareness of arresting officers," Reply Brief for Petitioner 4–5. See also *post*, at 10, n. 7 (GINSBURG, J., dissenting). We have already held that "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances." *Leon*, 468 U. S., at 922, n. 23. These circumstances frequently include a particular officer's knowledge and experience, but that does not make the test any more subjective than the one for probable cause, which looks to an officer's knowl-

edge and experience, *Ornelas* v. *United States*, 517 U. S. 690, 699–700 (1996), but not his subjective intent, *Whren* v. *United States*, 517 U. S. 806, 812–813 (1996).

4. We do not suggest that all recordkeeping errors by the police are immune from the exclusionary rule. In this case, however, the conduct at issue was not so objectively culpable as to require exclusion. In *Leon* we held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." 468 U. S., at 922. The same is true when evidence is obtained in objectively reasonable reliance on a subsequently recalled warrant.

If the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests, exclusion would certainly be justified under our cases should such misconduct cause a Fourth Amendment violation. We said as much in *Leon*, explaining that an officer could not "obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search." *Id.*, at 923, n. 24 (citing *Whiteley* v. *Warden, Wyo. State Penitentiary*, 401 U. S. 560, 568 (1971)). Petitioner's fears that our decision will cause police departments to deliberately keep their officers ignorant, Brief for Petitioner 37–39, are thus unfounded.

The dissent also adverts to the possible unreliability of a number of databases not relevant to this case. *Post*, at 8–9. In a case where systemic errors were demonstrated, it might be reckless for officers to rely on an unreliable warrant system. See *Evans*, 514 U. S., at 17 (O'Connor, J., concurring) ("Surely it would *not* be reasonable for the police to rely . . . on a recordkeeping system . . . that *routinely* leads to false arrests" (second emphasis added)); *Hudson*, 547 U. S., at 604 (KENNEDY, J., concurring) ("If a

*widespread pattern* of violations were shown . . . there would be reason for grave concern" (emphasis added)). But there is no evidence that errors in Dale County's system are routine or widespread. Officer Anderson testified that he had never had reason to question information about a Dale County warrant, App. 27, and both Sandy Pope and Sharon Morgan testified that they could remember no similar miscommunication ever happening on their watch, *id.*, at 33, 61–62. That is even less error than in the database at issue in *Evans*, where we also found reliance on the database to be objectively reasonable. 514 U. S., at 15 (similar error "every three or four years"). Because no such showings were made here, see 451 F. Supp. 2d, at 1292,[5] the Eleventh Circuit was correct to affirm the denial of the motion to suppress.

\*    \*    \*

Petitioner's claim that police negligence automatically triggers suppression cannot be squared with the principles underlying the exclusionary rule, as they have been explained in our cases. In light of our repeated holdings that the deterrent effect of suppression must be substantial and outweigh any harm to the justice system, *e.g.*, *Leon*, 468 U. S., at 909–910, we conclude that when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of

---

[5] JUSTICE GINSBURG notes that at an earlier suppression hearing Morgan testified—apparently in confusion—that there had been miscommunications "[s]everal times." *Post*, at 3, n. 2 (quoting App. to Pet. for Cert. 17a). When she later realized that she had misspoken, Morgan emphatically corrected the record. App. 61–62. Noting this, the District Court found that "Morgan's 'several times' statement is confusing and essentially unhelpful," and concluded that there was "no credible evidence of routine problems with disposing of recalled warrants." 451 F. Supp. 2d, at 1292. This factual determination, supported by the record and credited by the Court of Appeals, see 492 F. 3d, at 1219, is of course entitled to deference.

constitutional requirements, any marginal deterrence does not "pay its way." *Id.,* at 907–908, n. 6 (internal quotation marks omitted). In such a case, the criminal should not "go free because the constable has blundered." *People* v. *Defore*, 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926) (opinion of the Court by Cardozo, J.).

The judgment of the Court of Appeals for the Eleventh Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–513

## BENNIE DEAN HERRING, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[January 14, 2009]

JUSTICE GINSBURG, with whom JUSTICE STEVENS,
JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

Petitioner Bennie Dean Herring was arrested, and
subjected to a search incident to his arrest, although no
warrant was outstanding against him, and the police
lacked probable cause to believe he was engaged in crimi-
nal activity. The arrest and ensuing search therefore
violated Herring's Fourth Amendment right "to be secure
. . . against unreasonable searches and seizures." The
Court of Appeals so determined, and the Government does
not contend otherwise. The exclusionary rule provides
redress for Fourth Amendment violations by placing the
government in the position it would have been in had
there been no unconstitutional arrest and search. The
rule thus strongly encourages police compliance with the
Fourth Amendment in the future. The Court, however,
holds the rule inapplicable because careless recordkeeping
by the police—not flagrant or deliberate misconduct—
accounts for Herring's arrest.

I would not so constrict the domain of the exclusionary
rule and would hold the rule dispositive of this case: "[I]f
courts are to have any power to discourage [police] error of
[the kind here at issue], it must be through the application
of the exclusionary rule." *Arizona* v. *Evans*, 514 U. S. 1,
22–23 (1995) (STEVENS, J., dissenting). The unlawful

search in this case was contested in court because the
police found methamphetamine in Herring's pocket and a
pistol in his truck.  But the "most serious impact" of the
Court's holding will be on innocent persons "wrongfully
arrested based on erroneous information [carelessly main-
tained] in a computer data base."  *Id.*, at 22.

I

A warrant for Herring's arrest was recalled in February
2004, apparently because it had been issued in error.  See
Brief for Petitioner 3, n. 1 (citing App. 63).  The warrant
database for the Dale County Sheriff's Department, how-
ever, does not automatically update to reflect such
changes.  App. 39–40, 43, 45.  A member of the Dale
County Sheriff's Department—whom the parties have not
identified—returned the hard copy of the warrant to the
County Circuit Clerk's office, but did not correct the De-
partment's database to show that the warrant had been
recalled.  *Id.*, at 60.  The erroneous entry for the warrant
remained in the database, undetected, for five months.

On a July afternoon in 2004, Herring came to the Coffee
County Sheriff's Department to retrieve his belongings
from a vehicle impounded in the Department's lot.  *Id.*, at
17.  Investigator Mark Anderson, who was at the Depart-
ment that day, knew Herring from prior interactions:
Herring had told the district attorney, among others, of
his suspicion that Anderson had been involved in the
killing of a local teenager, and Anderson had pursued
Herring to get him to drop the accusations.  *Id.*, at 63–64.
Informed that Herring was in the impoundment lot,
Anderson asked the Coffee County warrant clerk whether
there was an outstanding warrant for Herring's arrest.
*Id.*, at 18.  The clerk, Sandy Pope, found no warrant.  *Id.*,
at 19.

Anderson then asked Pope to call the neighboring Dale
County Sheriff's Department to inquire whether a warrant

to arrest Herring was outstanding there. Upon receiving Pope's phone call, Sharon Morgan, the warrant clerk for the Dale County Department, checked her computer database. As just recounted, that Department's database preserved an error. Morgan's check therefore showed—incorrectly—an active warrant for Herring's arrest. *Id.*, at 41. Morgan gave the misinformation to Pope, *ibid.*, who relayed it to Investigator Anderson, *id.*, at 35. Armed with the report that a warrant existed, Anderson promptly arrested Herring and performed an incident search minutes before detection of the error.

The Court of Appeals concluded, and the Government does not contest, that the "failure to bring the [Dale County Sheriff's Department] records up to date [was] 'at the very least negligent.'" 492 F. 3d 1212, 1217 (CA11 2007) (quoting *Michigan* v. *Tucker*, 417 U. S. 433, 447 (1974)). And it is uncontested here that Herring's arrest violated his Fourth Amendment rights. The sole question presented, therefore, is whether evidence the police obtained through the unlawful search should have been suppressed.[1] The Court holds that suppression was unwarranted because the exclusionary rule's "core concerns" are not raised by an isolated, negligent recordkeeping error attenuated from the arrest. *Ante*, at 9, 12.[2] In my view, the Court's opinion underestimates the need for a forceful exclusionary rule and the gravity of recordkeeping

———————

[1] That the recordkeeping error occurred in Dale County rather than Coffee County is inconsequential in the suppression analysis. As the Court notes, "we must consider the actions of all the police officers involved." *Ante*, at 4. See also *United States* v. *Leon*, 468 U. S. 897, 923, n. 24 (1984).

[2] It is not altogether clear how "isolated" the error was in this case. When the Dale County Sheriff's Department warrant clerk was first asked: "[H]ow many times have you had or has Dale County had problems, any problems with communicating about warrants," she responded: "Several times." App. to Pet. for Cert. 17a (internal quotation marks omitted).

errors in law enforcement.

## II

## A

The Court states that the exclusionary rule is not a defendant's right, *ante*, at 5; rather, it is simply a remedy applicable only when suppression would result in appreciable deterrence that outweighs the cost to the justice system, *ante*, at 12. See also *ante*, at 9 ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.").

The Court's discussion invokes a view of the exclusionary rule famously held by renowned jurists Henry J. Friendly and Benjamin Nathan Cardozo. Over 80 years ago, Cardozo, then seated on the New York Court of Appeals, commented critically on the federal exclusionary rule, which had not yet been applied to the States. He suggested that in at least some cases the rule exacted too high a price from the criminal justice system. See *People* v. *Defore*, 242 N. Y. 13, 24–25, 150 N. E. 585, 588–589 (1926). In words often quoted, Cardozo questioned whether the criminal should "go free because the constable has blundered." *Id.*, at 21, 150 N. E., at 587.

Judge Friendly later elaborated on Cardozo's query. "The sole reason for exclusion," Friendly wrote, "is that experience has demonstrated this to be the only effective method for deterring the police from violating the Constitution." The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 951 (1965). He thought it excessive, in light of the rule's aim to deter police conduct, to require exclusion when the constable had merely "blundered"—when a police officer committed a technical error in an on-the-spot judgment, *id.,* at 952, or made a "slight and unintentional miscalculation," *id.*, at 953. As the Court recounts, Judge Friendly suggested that deterrence

of police improprieties could be "sufficiently accomplished" by confining the rule to "evidence obtained by flagrant or deliberate violation of rights." *Ibid.; ante*, at 8.

## B

Others have described "a more majestic conception" of the Fourth Amendment and its adjunct, the exclusionary rule. *Evans*, 514 U. S., at 18 (STEVENS, J., dissenting). Protective of the fundamental "right of the people to be secure in their persons, houses, papers, and effects," the Amendment "is a constraint on the power of the sovereign, not merely on some of its agents." *Ibid.* (internal quotation marks omitted); see Stewart, The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365 (1983). I share that vision of the Amendment.

The exclusionary rule is "a remedy necessary to ensure that" the Fourth Amendment's prohibitions "are observed in fact." *Id.*, at 1389; see Kamisar, Does (Did) (Should) The Exclusionary Rule Rest On A "Principled Basis" Rather Than An "Empirical Proposition"? 16 Creighton L. Rev. 565, 600 (1983). The rule's service as an essential auxiliary to the Amendment earlier inclined the Court to hold the two inseparable. See *Whiteley* v. *Warden, Wyo. State Penitentiary*, 401 U. S. 560, 568–569 (1971). Cf. *Olmstead* v. *United States*, 277 U. S. 438, 469–471 (1928) (Holmes, J., dissenting); *id.*, at 477–479, 483–485 (Brandeis, J., dissenting).

Beyond doubt, a main objective of the rule "is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins* v. *United States*, 364 U. S. 206, 217 (1960). But the rule also serves other important purposes: It "enabl[es] the judiciary to avoid the taint of partnership in official lawlessness," and it "assur[es] the

people—all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government." *United States* v. *Calandra*, 414 U. S. 338, 357 (1974) (Brennan, J., dissenting). See also *Terry* v. *Ohio*, 392 U. S. 1, 13 (1968) ("A rule admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur."); Kamisar, *supra*, at 604 (a principal reason for the exclusionary rule is that "the Court's aid should be denied 'in order to maintain respect for law [and] to preserve the judicial process from contamination'" (quoting *Olmstead*, 277 U. S., at 484 (Brandeis, J., dissenting)).

The exclusionary rule, it bears emphasis, is often the only remedy effective to redress a Fourth Amendment violation. See *Mapp* v. *Ohio*, 367 U. S. 643, 652 (1961) (noting "the obvious futility of relegating the Fourth Amendment to the protection of other remedies"); Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 360 (1974) (describing the exclusionary rule as "the primary instrument for enforcing the [F]ourth [A]mendment"). Civil liability will not lie for "the vast majority of [F]ourth [A]mendment violations—the frequent infringements motivated by commendable zeal, not condemnable malice." Stewart, 83 Colum. L. Rev., at 1389. Criminal prosecutions or administrative sanctions against the offending officers and injunctive relief against widespread violations are an even farther cry. See *id.*, at 1386–1388.

## III

The Court maintains that Herring's case is one in which the exclusionary rule could have scant deterrent effect and therefore would not "pay its way." *Ante*, at 13 (internal

quotation marks omitted).  I disagree.

### A

The exclusionary rule, the Court suggests, is capable of only marginal deterrence when the misconduct at issue is merely careless, not intentional or reckless.  See *ante*, at 9, 11.  The suggestion runs counter to a foundational premise of tort law—that liability for negligence, *i.e.*, lack of due care, creates an incentive to act with greater care.  The Government so acknowledges.  See Brief for United States 21; cf. Reply Brief 12.

That the mistake here involved the failure to make a computer entry hardly means that application of the exclusionary rule would have minimal value.  "Just as the risk of *respondeat superior* liability encourages employers to supervise . . . their employees' conduct [more carefully], so the risk of exclusion of evidence encourages policymakers and systems managers to monitor the performance of the systems they install and the personnel employed to operate those systems."  *Evans*, 514 U. S., at 29, n. 5 (GINSBURG, J., dissenting).

Consider the potential impact of a decision applying the exclusionary rule in this case.  As earlier observed, see *supra*, at 2, the record indicates that there is no electronic connection between the warrant database of the Dale County Sheriff's Department and that of the County Circuit Clerk's office, which is located in the basement of the same building.  App. 39–40, 43, 45.  When a warrant is recalled, one of the "many different people that have access to th[e] warrants," *id.*, at 60, must find the hard copy of the warrant in the "two or three different places" where the department houses warrants, *id.*, at 41, return it to the Clerk's office, and manually update the Department's database, see *id.*, at 60.  The record reflects no routine practice of checking the database for accuracy, and the failure to remove the entry for Herring's warrant was not

discovered until Investigator Anderson sought to pursue Herring five months later. Is it not altogether obvious that the Department could take further precautions to ensure the integrity of its database? The Sheriff's Department "is in a position to remedy the situation and might well do so if the exclusionary rule is there to remove the incentive to do otherwise." 1 W. LaFave, Search and Seizure §1.8(e), p. 313 (4th ed. 2004). See also *Evans*, 514 U. S., at 21 (STEVENS, J., dissenting).

## B

Is the potential deterrence here worth the costs it imposes? See *ante*, at 9. In light of the paramount importance of accurate recordkeeping in law enforcement, I would answer yes, and next explain why, as I see it, Herring's motion presents a particularly strong case for suppression.

Electronic databases form the nervous system of contemporary criminal justice operations. In recent years, their breadth and influence have dramatically expanded. Police today can access databases that include not only the updated National Crime Information Center (NCIC), but also terrorist watchlists, the Federal Government's employee eligibility system, and various commercial databases. Brief for Electronic Privacy Information Center (EPIC) et al. as *Amicus Curiae* 6. Moreover, States are actively expanding information sharing between jurisdictions. *Id.*, at 8–13. As a result, law enforcement has an increasing supply of information within its easy electronic reach. See Brief for Petitioner 36–37.

The risk of error stemming from these databases is not slim. Herring's *amici* warn that law enforcement databases are insufficiently monitored and often out of date. Brief for *Amicus* EPIC 13–28. Government reports de-

scribe, for example, flaws in NCIC databases,[3] terrorist watchlist databases,[4] and databases associated with the Federal Government's employment eligibility verification system.[5]

Inaccuracies in expansive, interconnected collections of electronic information raise grave concerns for individual liberty. "The offense to the dignity of the citizen who is arrested, handcuffed, and searched on a public street simply because some bureaucrat has failed to maintain an accurate computer data base" is evocative of the use of general warrants that so outraged the authors of our Bill of Rights. *Evans*, 514 U. S., at 23 (STEVENS, J., dissenting).

## C

The Court assures that "exclusion would certainly be justified" if "the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests." *Ante*, at 11. This concession provides little comfort.

First, by restricting suppression to bookkeeping errors that are deliberate or reckless, the majority leaves Herring, and others like him, with no remedy for violations of

---

[3] See Dept. of Justice, Bureau of Justice Statistics, P. Brien, Improving Access to and Integrity of Criminal History Records, NCJ 200581 (July 2005), available at http://www.ojp.usdoj.gov/bjs/pub/pdf/iaichr.pdf (All Internet materials as visited Jan. 12, 2009, and included in Clerk of Court's case file.).

[4] See Dept. of Justice, Office of Inspector General, Audit of the U. S. Department of Justice Terrorist Watchlist Nomination Processes, Audit Rep. 08–16 (Mar. 2008), http://www.usdoj.gov/oig/reports/plus/a0816/final.pdf.

[5] See Social Security Admin., Office of Inspector General, Congressional Response Report: Accuracy of the Social Security Administration's Numident File, A–08–06–26100 (Dec. 2006), http://www.ssa.gov/oig/ADOBEPDF/A–08–06–26100.pdf.

their constitutional rights. See *supra*, at 6. There can be no serious assertion that relief is available under 42 U. S. C. §1983. The arresting officer would be sheltered by qualified immunity, see *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), and the police department itself is not liable for the negligent acts of its employees, see *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658 (1978). Moreover, identifying the department employee who committed the error may be impossible.

Second, I doubt that police forces already possess sufficient incentives to maintain up-to-date records. The Government argues that police have no desire to send officers out on arrests unnecessarily, because arrests consume resources and place officers in danger. The facts of this case do not fit that description of police motivation. Here the officer wanted to arrest Herring and consulted the Department's records to legitimate his predisposition. See App. 17–19.[6]

Third, even when deliberate or reckless conduct is afoot, the Court's assurance will often be an empty promise: How is an impecunious defendant to make the required showing? If the answer is that a defendant is entitled to discovery (and if necessary, an audit of police databases), see Tr. of Oral Arg. 57–58, then the Court has imposed a considerable administrative burden on courts and law enforcement.[7]

---

[6] It has been asserted that police departments have become sufficiently "professional" that they do not need external deterrence to avoid Fourth Amendment violations. See Tr. of Oral Arg. 24–25; cf. *Hudson* v. *Michigan*, 547 U. S. 586, 598–599 (2006). But professionalism is a sign of the exclusionary rule's efficacy—not of its superfluity.

[7] It is not clear how the Court squares its focus on deliberate conduct with its recognition that application of the exclusionary rule does not require inquiry into the mental state of the police. See *ante*, at 10; *Whren* v. *United States*, 517 U. S. 806, 812–813 (1996).

### IV

Negligent recordkeeping errors by law enforcement threaten individual liberty, are susceptible to deterrence by the exclusionary rule, and cannot be remedied effectively through other means. Such errors present no occasion to further erode the exclusionary rule. The rule "is needed to make the Fourth Amendment something real; a guarantee that does not carry with it the exclusion of evidence obtained by its violation is a chimera." *Calandra*, 414 U. S., at 361 (Brennan, J., dissenting). In keeping with the rule's "core concerns," *ante*, at 9, suppression should have attended the unconstitutional search in this case.

\*    \*    \*

For the reasons stated, I would reverse the judgment of the Eleventh Circuit.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–513

———————

## BENNIE DEAN HERRING, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[January 14, 2009]

JUSTICE BREYER, with whom JUSTICE SOUTER joins, dissenting.

I agree with JUSTICE GINSBURG and join her dissent. I write separately to note one additional supporting factor that I believe important. In *Arizona* v. *Evans*, 514 U. S. 1 (1995), we held that recordkeeping errors made by a court clerk do not trigger the exclusionary rule, so long as the police reasonably relied upon the court clerk's recordkeeping. *Id.*, at 14; *id.*, at 16–17 (O'Connor, J., concurring). The rationale for our decision was premised on a distinction between judicial errors and police errors, and we gave several reasons for recognizing that distinction.

*First*, we noted that "the exclusionary rule was historically designed as a means of deterring *police* misconduct, not mistakes by court employees." *Id.*, at 14 (emphasis added). *Second*, we found "no evidence that court employees are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." *Id.*, at 14–15. *Third*, we recognized that there was "no basis for believing that application of the exclusionary rule. . . [would] have a significant effect on court employees responsible for informing the police that a warrant has been quashed. Because court clerks are not adjuncts to the law enforcement team engaged in the often competitive enter-

prise of ferreting out crime, they have no stake in the outcome of particular criminal prosecutions." *Id.*, at 15 (citation omitted). Taken together, these reasons explain why police recordkeeping errors should be treated differently than judicial ones.

Other cases applying the "good faith" exception to the exclusionary rule have similarly recognized the distinction between police errors and errors made by others, such as judicial officers or legislatures. See *United States* v. *Leon*, 468 U. S. 897 (1984) (police reasonably relied on magistrate's issuance of warrant); *Massachusetts* v. *Sheppard*, 468 U. S. 981 (1984) (same); *Illinois* v. *Krull*, 480 U. S. 340 (1987) (police reasonably relied on statute's constitutionality).

Distinguishing between police recordkeeping errors and judicial ones not only is consistent with our precedent, but also is far easier for courts to administer than THE CHIEF JUSTICE's case-by-case, multifactored inquiry into the degree of police culpability. I therefore would apply the exclusionary rule when police personnel are responsible for a recordkeeping error that results in a Fourth Amendment violation.

The need for a clear line, and the recognition of such a line in our precedent, are further reasons in support of the outcome that JUSTICE GINSBURG's dissent would reach.